IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                      No. CR 04-1208 JB

DOMINIC JACQUEZ and
VERONICA GALLEGOS,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendants' Motion to Suppress Illegally

Gathered Evidence, filed September 14, 2004 (Doc. 33); and (ii) Defendant Dominic Jacquez' Motion

to Suppress Illegally Gathered Evidence, filed September 30, 2004 (Doc. 38). The Court held an

evidentiary hearing on these motions on January 20, 2005. The Court also held a hearing on oral

argument on January 27, 2005. The primary issues are whether: (i) the initial traffic stop and the

continued detention were lawful; (ii) the subsequent search of the vehicle, including a fanny pack, was

lawful under the inventory exception; and (iii) whether Jacquez gave a valid, voluntary consent to

search his home, located at 8500 Foothills Drive in Farmington New Mexico. Because the Court

concludes that the officers acted lawfully, the Court will deny the motions to suppress.

## STANDARD OF REVIEW

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential

findings on the record when deciding a motion that involves factual issues. The findings of fact in this

Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule

12(d). The Court makes these findings under the authority of rule 104(a) of the Federal Rules of

Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search. See United States v. Merritt, 695 F.2d 1263, 1269 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges do not bind the Court.  See Fed. R. Evid. 1101(d)(1). Thus, the Court may consider hearsay in ruling on a motion to suppress. See United States v. Merritt, 695 F.2d at 1269.

## FINDINGS OF FACT

**1.      Vehicle Search.**

1.      On April 8, 2004, San Juan County Sheriff's Deputy Connie Johnston received a tip from an informant that a black Cadillac Escalade bearing New Mexico license plate 382 NFD was driving away from a residence that had a history of drug-related activity.[1]  See Narrative for Field Report 200400012083, at 1.

2.      Johnston ran the plate, which returned the name Tommy Largo.   See Transcript of Hearing at 74:6-9 (Brian Dennis); 105:2-8 (Connie Johnston) (taken January 20, 2005).[2]

3.      Johnston gave this information to Deputy Brian Dennis and Dennis later that same day located the Escalade traveling west on U.S. Highway 64. See id. at 30:17-32:17 (Dennis); Narrative for Field Report 200400012083, at 1.

4.      While Johnston was talking on the radio with Dennis, Deputy Steve Saiz also got on

---

[1]  At the time of the described events Deputy Connie Johnston was unmarried and went by the name Connie Wolf.  At the time of hearing, Connie Wolf had married and changed her name to Connie Johnston.

[2]  The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any finalized transcript may contain slightly different page and/or line numbers.

the radio and told Dennis that he had seen Largo's vehicle within the last week and that Largo had

a warrant for his arrest.  Dennis thought Saiz said that Saiz had seen Tommy Largo driving the

Escalade within the last week, but later learned that Saiz had only seen the vehicle within the last

week.  See Transcript of Hearing at 35:15-36:12 (Dennis).

5.      Dennis had lived in Farmington all of his life, and had never before this incident heard

the name Tommy Largo.  See id. at 92:6-13

6.      While the Escalade was stopped at a gas station, Dennis, through his vehicle

computer, verified that there was an outstanding warrant for Tommy Largo's arrest.  See id. at 32:18-

34-7; 75:18-76:2.

7.       Dennis observed what appeared to be an unidentified male pumping gas.   See id. at

33:14-16.

8.      After the Escalade exited the gas station and pulled back onto Highway 64, Dennis

activated his emergency equipment and pulled  the Escalade over as it was driving northbound on

Andrea Drive in Farmington, New Mexico.  See id. at 33:24-35:7.

9.      Before pulling the Escalade over, Dennis had no identifying information for Largo.

See id. at 32:18-35:2.

10.      Dominic Jacquez was driving the Escalade, and Veronica Gallegos sat in the front

passenger seat.  See id. at 17:8-24 (Veronica Gallegos).

11.       At the time of the traffic stop, Largo, the registered owner of the vehicle, was an

elderly  man.  The Tommy Largo who had a warrant out for his arrest was born much later.  See id.

at 58:2-16 (Dennis).

12.      Jacquez, is a 22 year-old male.    See New Mexico Wants and Warrants

200404081135070959717 at 1 (executed April 8, 2004).

13.    Dennis got out of his vehicle and made contact with Jacquez.  See Transcript of Hearing at 36:13-16 (Dennis).

14.    Jacquez handed Dennis an identification card bearing the name Dominic Jacquez.  See id. at 36:21-37:3.

15.    Jacquez stated that he had a license, but was unable to produce it.  See id. at 38:10-16.

16.    Jacquez told Dennis that he had borrowed the Escalade from someone named Mike, but, upon Dennis' request, either could not or would not give "Mike's" last name.  See id. at 39:20-40:6.

17.    Jacquez told Dennis that he had only been in possession of the Escalade for approximately two hours.  See id. at 40:21-22.

18.    Saiz and Deputy Mike Scott arrived at the scene separately, shortly after the traffic stop.  See id. at 151:22-152:17 (Mike Scott).

19.    Johnston arrived after Saiz and Scott.  See id. at 107:21-25 (Johnston).

20.    Dennis returned to his vehicle and ran Jacquez' information in his mobile data terminal, which showed that Jacquez had a suspended license and a Valencia County arrest warrant.  See id. at 38:21-24 (Dennis).

21.    Dennis then got on his radio and asked his data channel to verify the suspended license and check for outstanding warrants.  See id. at 38:25-39:2.

22.    These records verified that Jacquez' driver's license had been suspended and additionally showed that Jacquez had an outstanding warrant in San Juan County.  See id. at 39:1-8.

23.     Dennis informed Jacquez that he was under arrest and subsequently placed him under arrest for the outstanding San Juan County warrant and for driving on a suspended license.  See id. at 39:18-19.

24.     Jacquez exited the vehicle, was handcuffed, searched, and placed in a police cruiser. See id. at 39:18-19; 73:1-5.

25.     During a search incident to arrest, Dennis found $1800.00 in U.S. currency, a red notebook that appeared to be a "pay-owe" sheet, and a cellular telephone in Jacquez' front pockets. See Narrative for Field Report 200400012083, at 2.

26.     Gallegos exited the vehicle carrying her purse and a fanny pack.  See Transcript of Hearing at 154:18-23 (Scott).

27.     At the same time, Dennis took the purse and the fanny pack out of Gallegos' hands, and placed them on the hood of a police cruiser.  See Affidavit of Veronica Gallegos ¶ 8, at 2.

28.     Dennis and the other officers instructed Gallegos to stand by the rear of the vehicle. See id. ¶ 9, at 2

29.     Police department policy requires a vehicle to be towed for safekeeping if the registered owner is arrested or is not present.  See Transcript of Hearing at 41:1-10 (Dennis).

30.     Department written policy requires that a vehicle shall not be towed after a non-DWI arrest when the registered owner or legal custodian requests the vehicle not be towed and agrees to sign a Hold Harmless Agreement. See id. at 164:7-14 (Scott); Vehicle Impoundment/Towing Policy at 1 (dated January 4, 1995).

31.     Department policy requires an inventory search of a vehicle before towing.  See Transcript of Hearing at 112:6-12 (Johnston); 42:7-16 (Dennis).

32.     The inventory search is used for the purpose of protecting officers from being accused of stealing or taking valuables from the vehicle as well as to safeguard the owner's items.  See id. at 42:17-19 (Dennis); 112:8-12 (Johnston).

33.     Department policy requires that all unlocked containers be searched as part of the inventory search.  See id. at 42:20-43:5 (Dennis).

34.     One or more deputies then began an inventory search of the Escalade.  See id. at 42:5-8.

35.     Dennis informed Gallegos that she would be free to go, but asked permission to search her bags.  She refused.  See Affidavit of Veronica Gallegos ¶ 10, at 2.[3]

36.     Dennis or another deputy asked Gallegos if she would like to sit in a police cruiser to stay warm.  See id. ¶ 13, at 2.

37.     Before Gallegos could reach the cruiser, Dennis or another of his colleagues informed her that, she could not take her bags with her into the police cruiser unless they were searched for "officer safety."  See Transcript of Hearing at 44:18-21 (Dennis).

38.     Gallegos said that the deputies could search her purse, but that they could not search the fanny pack because it was not hers.  See Affidavit of Veronica Gallegos ¶ 15, at 2-3.

39.     She stated that she did not know to whom the fanny pack belonged, but that she had grabbed it as she was leaving the house and that it might contain some plastic baggies and marijuana.

---

[3]Gallegos did not testify live voice concerning the events leading up to the search of the fanny pack.  She submitted an affidavit, which the Court has considered.  Because, however, the Court finds that the officers who testified under oath concerning these events were credible, and because Gallegos did not subject herself to cross-examination on the events leading up to the search of the fanny pack, the Court will not credit the statements in Gallegos' Affidavit where inconsistent with the testimony of the officers.

See Transcript of Hearing at 43:22-44:11 (Dennis).

40.     One of the officers stated the fanny pack had to go back in the Escalade.  Before Gallegos could respond, however, an officer took the fanny pack off the car's hood and placed it in the Escalade.  See Affidavit of Veronica Gallegos ¶¶ 17,19, at 3.

41.     Gallegos then sat down in the  rear of Scott's police vehicle, and Dennis began searching the fanny pack.  See Transcript of Hearing at 110:17-19 (Johnston); 46:16-18 (Dennis); 44:18-24 (Dennis).

42.     The fanny pack search was made as part of the inventory search.  See id. at 42:10-46:21 (Dennis).

43.     The officers conducted the inventory search in good faith, according to department policy, and the search was not a ruse to find incriminating evidence.  See id. at 41:1-10 (Dennis); 164:7-14 (Scott); 112:6-12 (Johnston); 42:17-19 (Dennis); 112:8-12 (Johnston); 42:20-43:5 (Dennis).

44.     Inside the fanny pack, Dennis found two digital scales, some rolled-up plastic baggies, a plastic bag containing 83.5 grams of suspected methamphetamine inside, and documents with the name of Dominic Jacquez.  See id. at 46:16-48:1 (Dennis).

45.     In the vehicle, Dennis also found a handgun underneath the driver's seat.  As Dennis placed the gun into the vehicle, Jacquez said that the gun was his and that he had purchased it from his cousin.  See id. at 47:4-15.

46.     Dennis placed both Gallegos and Jacquez under arrest.  See id. at 47:22-48:2.

47.     Jacquez was also charged with driving on a suspended license and booked for his outstanding traffic warrant.  See Narrative for Field Report 200400012083, at 3.

## 2.    Home Search.

48.    On June 1, 2004, the Honorable Don J. Svet, United States Magistrate Judge, authorized federal criminal complaints against Jacquez and Gallegos based on the methamphetamine seized from the fanny pack on April 8.  Arrest warrants were issued on the complaints.  See Criminal Complaint 04m00366 at 1.

49.    On June 2, 2004, Gallegos was arrested based on the June 1, 2004 arrest warrant pursuant to a traffic stop.  See Transcript of Hearing at 175:17-176:19 (James Harley).

50.    Later that same day, DEA Special Agent James Harley called Jacquez and told him that Gallegos had been arrested on a warrant and that she wanted her personal property released to Jacquez.  Jacquez stated that he "wasn't here."  Harley asked Jacquez what he meant.  Jacquez said that he was not at home and that he would make arrangements to pick up Gallegos' property.  See id. at 176:21-177:15.

51.    Believing that Jacquez was at the residence -- 8500 Foothills Drive in Farmington -- Harley and three officers -- NMSP Officer Joe Ballesteros, NMSP Agents Keith Salazar, and Gary Chavez -- drove to the residence approximately fifteen minutes later.  See id. 177:16-23.

52.    As the officers approached the residence, a female later identified as Monica Alba walked out of the residence.  Alba represented that Jacquez was not inside the residence.  Harley nevertheless asked Alba to call Jacquez and tell him to come outside.  See id. at 177:24-178:9.

53.    Alba called Jacquez and told him that he needed to come outside.  See id. at 178:3-5.

54.    Ballesteros and Chavez walked around the residence to secure the back, and Harley and Salazar stayed at the front of the residence, while Alba was on the telephone.  See id. at 179:16-181:18.

55.     Jacquez walked out of the residence shortly thereafter.   See id. at 178:10-12.

56.     Neither agent pointed a firearm at Jacquez as he was exiting the house.   See id. at 181:19-182:5.

57.     To conceal their identities, Salazar and Chavez wore masks that covered their faces. See id. at 180:4-23.

58.     Salazar handcuffed Jacquez and placed him in a police vehicle.   See id. at 182:24-183:10.

59.     After placing Jacquez in the police vehicle, Harley advised Jacquez of his Miranda rights, which Jacquez waived.  Harley spoke to Jacquez through the partially open window.  Salazar took off his mask and stood near Harley, while Ballesteros was standing near the driver's door.  See id. at 218:12-220:1 ( Keith Salazar).

60.     Jacquez told Harley during the interview that he "smoked a lot of weed" and was "high." See id. at 184:12-13 (Harley).

61.     Jacquez was coherent.  See id. at 218:3-10 (Salazar).

62.     Harley asked Jacquez for consent to search the residence.   See id. at 187:10-12 (Harley).

63.     Jacquez responded that the residence belonged to his sister, but that he sometimes resided there.  See id. at 220:6-10 (Salazar).

64.     Harley asked if there was anything in the residence about which Jacquez should be concerned.  Specifically, the agent asked Jacquez if there were any guns or drugs in the home. Jacquez replied that there were some guns and a small amount of marijuana in the residence, but that the guns were legal.  See id. at 186:24-187:2 (Harley).

65.     Harley told Jacquez that "they were not concerned with user amounts of weed." Id. at 187:5-8.

66.     Harley again requested permission from Jacquez to search the residence for drugs, guns, and illegal contraband.   See id. at 187:10-14.

67.     Jacquez verbally consented to such a search.   See id. at 187:15-16.

68.     The officers then produced a consent-to-search form.   See id. at 187:20-188:2.

69.     Harley read the consent-to-search form to Jacquez and asked Jacquez to sign it. Jacquez signed the form.  The form did not specify for what the officers were searching.  See id. at 187:23-188:7; Consent to Search at 1 (dated June 2, 2004).

70.     Fifteen to twenty minutes elapsed between the time Jacquez was placed under arrest and the time he signed the consent-to-search form.  See Transcript of Hearing at 228:1-6 (Salazar).

71.     None of the officers had weapons drawn when Jacquez consented verbally and in writing.  See id. at 219:13-14.

72.     The atmosphere was calm, and Jacquez did not appear to the officers to be frightened.  See id. at 219:21; 227:24-25.

73.     Jacquez gave his consent voluntarily.  The officers did not coerce, by explicit or implicit means, or by implied or covert force.  Jacquez' consent was unequivocal, specific, and freely and intelligently given.  The officers did not deceive Jacquez.  See id. at 187:10-14 (Harley); 187:15-16 (Harley); 187:20-188:2 (Harley); 187:23-188:7 (Harley); 228:1-6, 219:13-14 (Salazar); 219:21; 227:24-25 (Salazar).

74.     The officers subsequently searched the residence and found a baggy containing a white substance believed to be cocaine, a loaded 7.62 caliber (AK-47) magazine next to the baggy, and

within arms reach of several guns, including an AK-47.  See id. at 190:21-191:14 (Harley).

75.    At that point, the agents secured the residence and obtained a state search warrant.
See id. at 191:15-193:14; Search Warrant at 1 (dated June 3, 2004).

76.    During the warrant's execution, agents found, among other things, methamphetamine,
guns, baggies, and scales.  See Transcript of Hearing at 195:1-9.

77.    The Court held an evidentiary hearing on the motions on January 20, 2005.

78.    The Court finds that Dennis, Johnston, Scott, Harley and Salazar were very credible
in their testimonies in the January 20, 2005 hearing.

79.    At the January 20, 2005 hearing, Jacquez was present, but the hearing was not
concluded.  At that time, Jacquez was scheduled to testify on January 27, 2005 when the hearing
continued.  Jacquez did not show up at that scheduled hearing on January 27, 2005 and therefore did
not testify.  He also had failed to appear at a hearing the previous day in front of The Honorable
Robert Hayes Scott, United States Magistrate Judge, concerning an alleged violation of pretrial
release conditions in the present case.  The Honorable Robert Hayes Scott issued a warrant for
Jacquez' failure to appear at that hearing.  See id. at 223:14-18. (The Honorable James O.
Browning); Transcript of Hearing at 3:1-4:3 (taken January 27, 2005) (Romero).

## PROCEDURAL BACKGROUND

Jacquez and Gallegos move the Court, pursuant to the Fourth Amendment of the United
States Constitution and applicable statutes and rules, to suppress any evidence directly and indirectly
derived from the allegedly unlawful search of the automobile.[4]  Jacquez also moves, pursuant to the

---

[4]The Defendants stated in their motions that they intended to request leave of the Court to
subpoena the security videos from the gas station as well as the deputies' belt tapes.  The Defendants
did not, however, make these requests.

Fourth Amendment, the Court to suppress any evidence directly and indirectly derived from the unlawful search of his home.

## FOURTH AMENDMENT LAW

The Fourth Amendment protects Jacquez' right to be secure in his person and effects against unreasonable searches and seizures.  In analyzing Fourth Amendment search and seizure issues, the United States Court of Appeals for the Tenth Circuit has separated police and citizen interactions into three categories: (i) consensual encounters, (ii) investigative stops, and (iii) arrests.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).  "A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'"  United States v. Tibbetts, 396 F.3d 1132, 1136 (10th Cir. 2005) (quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)).

### 1.       Investigative Detention.

The  Tenth  Circuit  analyzes  ordinary  traffic  stops  as  being  analogous  to  investigative detentions.  See United States v. Tibbetts, 396 F.2d at 1136, (citing United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995)).  A seizure by means of an investigative detention is unconstitutional unless "supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity."  United States v. Davis, 94 F.3d 1465, 1468 (10th Cir. 1996) (quoting Reid v. Georgia, 448 U.S. 438, 440 (1980)).

Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements to be "reasonable" under the Fourth Amendment.  First, the officer "'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" United States v. Davis, 94 F.3d at 1469-70.  Second, the investigative detention

that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. 1, 20 (1968), because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out." United States v. Holt. 264 F.3d 1215, 1229 (10th Cir. 2001)(en banc).

The Tenth Circuit has held that the existence of objectively reasonable suspicion of illegal activity does not depend upon any one factor, but instead on the totality of the circumstances. See United States v. Soto, 988 F.2d 1548, 1555 (10th Cir. 1993); United States v. Bloom, 975 F.2d 1447, 1556 (10th Cir. 1992) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)) (overruled on other grounds by United States v. Little, 18 F.3d 1499 (10th Cir. 1994) (en banc)).

### 2.    Inventory Search.

"[A] search conducted without a warrant . . . is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  A warrantless inventory search of a vehicle conducted after the vehicle has been lawfully impounded by police is one such exception. See South Dakota v. Opperman, 428 U.S. 364 (1975). An inventory search of an automobile is permissible for three distinct purposes: (i) the protection of the owner's property while it remains in police custody; (ii) the protection of the police against claims of lost, stolen or vandalized property; and (iii) the protection of the police from danger. See id. at 369.  A warrantless inventory search is proper when the search is undertaken pursuant to standard police procedures as well as for the purpose of protecting the car and its contents. See United States v. Lugo, 978 F.2d 631, 636 (10th Cir. 1992) (citing South Dakota v. Opperman, 428 U.S. 364 (1975)).  The warrantless inventory search may not be used as a "ruse for a general rummaging in order to discover incriminating evidence." Id. at 636-637 (quoting Florida v. Wells, 495 U.S. 1, 4

(1990)).

### 3.    Consent.

A search conducted pursuant to voluntary consent is permissible under the Constitution. <u>See</u> <u>Schneckloth v. Bustamante</u>, 412 U.S. at 219 (1973).  Consent is voluntary if it is not "coerced, by explicit or implicit means, by implied threat or covert force."  <u>Id.</u> at 228.  <u>See</u> <u>United States v.</u> <u>Kimoana</u>, 383 F.3d 1215, 1225 (10th Cir. 2004) ("Consent is voluntary if there is no indication of either 'force or intimidation.'")(citation omitted).

The determination whether a defendant freely and voluntarily consents to a search is a question of fact and is derived from the totality of the circumstances.  <u>See</u> <u>United States v. Pena-Sarabia</u>, 297 F.3d 983, 986 (10th Cir. 2002); <u>United States v. Pena</u>, 143 F.3d 1363, 1366 (10th Cir. 1998).  To show that a consent to search is valid, and before the Court admits at trial evidence obtained during a search pursuant to consent, the government "must present clear and positive testimony that consent was unequivocal and specific and freely and intelligently given."  <u>See</u> <u>United States v. Pena-Sarabia</u>, 297 F.3d at 986; <u>United States v. Pena</u>, 143 F.3d at 1366 (citation omitted). Second, the government must show that the police did not coerce or deceive the defendant into granting his consent.  <u>See</u> <u>United States v. Pena-Sarabia</u>, 297 F.3d at 986 ("[G]overnment must show that the police did not coerce the defendant into granting consent.").  "[A] court should consider, *inter alia*, physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant within the totality of the circumstances."  <u>Id.</u> at 987.

### <u>ANALYSIS</u>

The Defendants' joint motion challenges the search of the car, and Jacquez' separate motion

challenges the search of the home.  The Court denies both motions.  The officer properly stopped the vehicle, detained Jacquez, and conducted a lawful inventory search.  Jacquez voluntarily gave consent to search his home.

## I.      JACQUEZ HAS STANDING TO CHALLENGE THE SEIZED EVIDENCE.

"It is axiomatic that the threshold issue of Fourth Amendment standing, whether the search in question violated the rights of the defendant seeking to exclude evidence, must first be addressed in deciding a motion to suppress."  United States v. Angulo-Fernandez, 53 F.3d 1177, 1179 (10th Cir. 1995).  Thus, as an initial matter, each defendant has the burden of establishing standing to challenge the searches of the Escalade, the fanny pack, and the residence.  See Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978).  The issue of standing as to Gallegos became moot when she entered into a plea agreement with the United States.  The United States has conceded that Jacquez has standing to challenge the initial seizure of the vehicle, the search of the fanny pack, and the search of the house. See Transcript of Hearing at 25:4-11 (taken January 20, 2005).

## II.     THE COURT WILL NOT SUPPRESS THE EVIDENCE DERIVED FROM THE VEHICLE'S SEARCH.

Jacquez argues that the court should suppress the evidence derived from the vehicle's search. In deciding whether to suppress the evidence from the search of the vehicle, the Court must consider whether the initial traffic stop and subsequent detention of Jacquez was based on reasonable suspicion of criminal activity and whether the fanny pack was searched as part of a valid inventory search of the vehicle.  The Court concludes that the police officers had reasonable suspicion, and their search of the fanny pack was part of a valid inventory search.

## A.   THE INITIAL TRAFFIC STOP AND CONTINUED DETENTION WAS LAWFUL

Jacquez contends that the initial stop was unlawful because it was not supported by reasonable suspicion.  In this case, Deputy Dennis had sufficient credible information to justify stopping the vehicle as an investigative detention, because he had a reasonable suspicion that the driver of the Escalade had an outstanding arrest warrant.  Specifically, Deputy Johnston had informed Dennis that a black Escalade was driving away from a residence that had a history of drug related activity, and that the registered owner of the Escalade was Tommy Largo.  See Transcript of Hearing at 116:14-117:5 (Johnston); 74:6-9 (Dennis).  Deputy Saiz informed Dennis via radio that he had seen Largo's vehicle during the last week and confirmed that Largo had a warrant out for his arrest.  See id. at 35:15-36:16 (Dennis).  Dennis ran the name Tommy Largo through his vehicle computer and saw that there was an outstanding warrant for his arrest.  See id. at 32:18-34-7; 75:18-76:2.  In addition, Dennis had no identifying information for Tommy Largo.  See id. at 32:18-35:2.  Dennis had no reason to believe that the person driving the Escalade was anyone other than Tommy Largo.  These facts meet the totality of the circumstances test set out in United States v. Bloom, 975 F.2d at 1556.  See United States v. Tellez, 11 F.3d 530, 532-33 (5th Cir. 1993).  In United States v. Tellez, a detective had received information that a known parole violator was seen driving a black pickup truck with large tires and a chrome roll bar with attached lights.  See id. at 531. The officer subsequently observed a vehicle matching that description at a gas station.  See id.  The officer could see that the driver was not the parole violator, but could not identify the passengers.  See id.  The officer stopped the vehicle to investigate whether the known parole violator was one of the unidentifiable passengers.  See id.  The United States Court of Appeals for the Fifth Circuit held that the detective had a sufficient reasonable suspicion to stop the truck to determine whether the known parole violator was

a passenger in the truck.  See id. at 532-33.

The facts in this case are similar to those in United States v. Tellez.  Dennis had received information that Largo was seen driving a black Escalade with a specific license plate.  He was also told that there was an arrest warrant for Largo.  He located the black Escalade and made a traffic stop to investigate whether Largo was in the vehicle.

Although Dennis stopped the vehicle based on the mistaken premise that the Tommy Largo who was the registered owner of the vehicle, was the same Tommy Largo who had an outstanding warrant, that mistake does not defeat the articulable facts that were the basis of the reasonable suspicion.  See United States v. Tibbetts, 396 F.3d 1132, 1138 (10th Cir. 2005) (We have consistently held that an officer's mistake of fact, as distinguished from a mistake of law, may support probable cause or reasonable suspicion necessary to justify a traffic stop.") (citing United States v. DeGasso, 369 F.3d 1139, 1144 (10th Cir. 2004); United States v. Salinas-Cano, 959 F.2d 861, 865 (10th Cir. 1992));  United States v. Shareef, 100 F.3d 1491, 1505 (10th Cir. 1996) ("A mistaken premise can furnish grounds for a Terry stop, if the officers do not know that it is mistaken and are reasonable in acting upon it.") (quoting  United States v. Ornelas-Ledesma, 16 F.3d 714, 718 (7th Cir. 1994), judgment vacated on other grounds by Ornelas v. United States, 517 U.S. 690  (1996).  Here, Dennis had no reason to know that his belief was mistaken, and based on what he did know, he was reasonable in relying on it.  Looking at all of the articulated facts, Dennis had at least an objectively  reasonable suspicion that Largo had an outstanding warrant, and that he was either a driver or a passenger in the Escalade.  Dennis knew that a Tommy Largo had an outstanding arrest warrant.  He knew that the Escalade was registered to a Tommy Largo.  He had never heard the name Tommy Largo before, even though Dennis had lived in Farmington his entire life.  Although

his belief was incorrect, he had at least a reasonable suspicion based on the articulated facts, that Tommy Largo had an outstanding warrant and was inside the Escalade.

Dennis acted lawfully in further detaining Jacquez after Jacquez handed him the identification card. After Jacquez gave the identification card to Dennis, Dennis was aware that the driver of the vehicle might not be Largo. Dennis nevertheless continued to detain Jacquez after he had information that Jacquez was not Largo. Although this continued detention might not be "reasonably related in scope to the circumstances" which justified the initial stop as required by Terry v. Ohio, 392 U.S. 1, 20 (1968), Dennis had subsequent justification to continue the detention. Jacquez could not present a valid drivers license to Dennis. See Transcript of Hearing at 38:10-16 (Dennis). NMSA § 66-5-16 (1978), requires a licensee to have a driver's license in immediate possession at all times when operating a motor vehicle. Jacquez was driving the Escalade without a license. The continued detention was lawful based on this violation.

The Court finds that the initial investigative stop as well as the continued detention of Jacquez was lawful.

## B.   THE SUBSEQUENT SEARCH OF THE VEHICLE INCLUDING THE FANNY PACK WAS LAWFUL

Jacquez contends that the search of the fanny pack was unlawful because Gallegos refused to give Dennis consent to search it, and it was put back in the Escalade by an officer without permission from Gallegos. Although Gallegos did not give consent to the search of the fanny pack and she did not tell the officers to put the fanny pack in the Escalade, the search of the fanny pack was lawful as part of a valid inventory search of the vehicle.

First, the officers had a permissible purpose to perform an inventory search under South Dakota v. Opperman, 428 U.S. at 369. The department performs inventory searches, pursuant to

department policy, to protect the police from later accusations of theft, as well as to safeguard the owner's items.  See Transcript of Hearing at 112:6-12 (Johnston); 42:17-19 (Dennis).

Second, the police undertook the search pursuant to standard police procedures.  See United States v. Lugo, 978 F.2d at 631.  Department procedure requires a vehicle to be towed when the registered owner is arrested or not present.  See Transcript of Hearing at 112:8-12 (Johnston). Department policy also requires an inventory search of a vehicle before towing.  See Transcript of Hearing at 112:6-12 (Johnston); 42:7-16 (Dennis). Department policy does not allow a vehicle to be towed when a non-DWI arrest has occurred and the registered owner or the legal custodian requests that the vehicle not be towed.  Here, Deputy Dennis followed the department procedure.

Jacquez contends that Dennis should have explained the policy to Jacquez before towing the vehicle.  The policy's plain language, however, gives no indication that the police have to explain the towing to the driver so that the driver can make a determination whether the vehicle should be towed. The policy merely states that a vehicle shall not be towed when the registered owner or the legal custodian requests that it not be towed. See id. at 164:7-14 (Scott); Vehicle Impoundment/Towing Policy at 1.  The policy's language puts the onus on the registered owner or legal custodian to make the request.  While it might be a good idea for the police to explain the policy, the Court should not rewrite the policy to mandate an explanation.

Moreover, even if the Court construes the policy to require that an explanation of the policy be given, this interpretation is irrelevant on the facts of this case.  The registered owner was not present, and Dennis could not find out if Jacquez was the legal custodian from the information Jacquez gave him.  Dennis asked Jacquez from whom he had borrowed the car.  Jacquez told him "Mike," and would not or could not give him Mike's last name.  The only information that Dennis

had in front of him was that the vehicle was registered to Tommy Largo and that Dominic Jacquez had borrowed the vehicle from someone named "Mike." Id. at 39:20-40:6 (Dennis).  Because the vehicle's registered owner was not present and Dennis had no reason to believe that Jacquez was the legal custodian, Dennis followed department policy by towing the vehicle.

Third, the inventory search was not used as a "ruse for a general rummaging in order to discover incriminating evidence." United States v. Lugo, 978 F.2d at 636-37.  To ensure that the search is not a ruse, the opening of containers must be conducted according to "standardized criteria . . . or established routine." Florida v. Wells 495 U.S. 1, 3-4 (1990) (quoting Illinois v. Lafayette, 462 U.S. 640, 648 (1983)).  Here, Dennis performed the search of the container according to department procedure.  Department policy requires that all unlocked containers be searched as part of an inventory search.  See Transcript of Hearing at 42:20-43:5 (Dennis).  The fanny pack was an unlocked container and thus the search of it was according to established routine.

Jacquez contends that Gallegos effectively limited the search of the fanny pack when she refused to give consent to the officers and told them that she did not know to whom it belonged. Defendant cites to United States v. Infante-Ruiz, 13 F.3d 498 (1st Cir. 1994), to support this position.  Infante-Ruiz is not instructive on this issue, because it addressed the scope of consent.  In Infante-Ruiz, an individual consented to a search of a car and its trunk, but the individual told the officer that a brief case belonged to someone else.  See id. at 505.  The Fifth Circuit held that, when the individual informed the police that the brief case belonged to another, the officer's authority to search the trunk based on consent was limited.  See id.  This situation is different.  The search here is based on an inventory search.  An inventory search does not require consent.  Instead, it requires a valid purpose, see South Dakota v. Opperman, 428 U.S. at 369, standard police procedure, and

absence of a ruse. see United States v. Lugo, 978 F.2d at 636-37.

Jacquez also contends that the officers should have left the fanny pack outside the vehicle when Gallegos refused to consent to its search.  The officers were, however, left with no reasonable choice but to put the fanny pack back in the vehicle.  Gallegos exited the vehicle with a purse and a fanny pack.  See Transcript of Hearing at 154:18-23 (Scott).  When questioned, Gallegos told the officers that the fanny pack was not hers, and that she did not know to whom the fanny pack belonged.  See id. at 43:22-44:11 (Dennis).  It defies logic to say that her consent was needed to search a fanny pack that she had effectively denied owning.  The officers were presented with a situation where an object had been taken out of a vehicle by someone who neither owned it nor had any knowledge of its ownership.  The fanny pack rightfully belonged in the vehicle because Gallegos did not own it and she had taken it from the Escalade.  The police reasonably did not let Gallegos take the fanny pack with her in the police car because she would not let them search it.  When given the choice of abandoning the fanny pack or putting it in the vehicle from whence it came, the officers made a reasonable decision in returning the fanny pack to the vehicle.  Once the police returned the fanny pack, the fanny pack was lawfully searched as part of the valid inventory search of the Escalade.

Finally, although the police department did have a written policy detailing when a vehicle could be towed, see Vehicle Impoundment/Towing Policy at 1, there is no evidence on the record that the department had a written policy concerning inventory searches, including inventory searches of unlocked containers.  Although there may not be a written policy concerning inventory searches, including inventory searches of unlocked containers, an oral policy is sufficient to meet the standard procedure test articulated in United States v. Lugo, 978 F.2d at 636-37.  See Molina v. Spanos, No. 98-4119, 1999 U.S. App. LEXIS 22370 at *24 (10th Cir. August 18, 1999) (declining to hold that

"standardized procedure" requires a written policy for inventory searches).[5]

The Court finds that the inventory search performed on the Escalade, including the search of the fanny pack, was lawful.

## III.    THE SEARCH OF THE HOUSE AT 8550 FOOTHILLS DRIVE WAS LAWFUL.

To determine whether the search of the house was lawful, the Court must consider, based on the totality of the circumstances, whether Jacquez' consent to search the house was voluntary. See United States v. Pena-Sarabia, 297 F.3d at 986. Jacquez gave oral consent and signed a consent-to-search form. See Transcript of Hearing at 187:15-16; 187:23-188:7. The Court must consider two issues to determine the voluntariness of consent: (i) whether the consent to search was unequivocal, specific, and freely and intelligently given; and (ii) whether the police coerced or deceived Defendant into granting consent. See U.S. v. Pena-Sarabia, 297 F.3d at 986.

### A.    THE CONSENT TO SEARCH WAS UNEQUIVOCAL, SPECIFIC, AND FREELY AND INTELLIGENTLY GIVEN

There is not a dispute that Jacquez gave consent to search. Instead, Jacquez contends that he gave his consent in the face of duress and intimidation and that he was under the influence of drugs at the time, and therefore his consent was neither freely nor intelligently given. He also contends that the consent was not unequivocal or specific because the consent-to-search form was vague. The totality of the circumstances, however, lead to the conclusion that Jacquez' consent was unequivocal,

---

[5]  The Tenth Circuit Rule 36.3( B) states: Citation to an unpublished decision is disfavored. But an unpublished decision may be cited to if: (i) it has persuasive value with respect to a material issue that has not been addressed in a published opinion; and (ii) it would assist the court in its disposition. This unpublished decision meets both these criteria and the rules therefore allow citation to this unpublished decision.

specific, and freely and intelligently given.[6]

First, only a short amount of time - - fifteen to twenty minutes - - elapsed between the time of the arrest and the time of the consent. See Transcript of Hearing at 228:1-6 (taken January 20, 2005) (Salazar). Second, although Jacquez alleges that he was under the influence of drugs, intoxication is not dispositive. See United States v. Gay, 774 F.2d 368, 376-77 (10th Cir. 1985) (defendant had capacity to give voluntary consent even though he swayed and staggered in an intoxicated state); United States v. Postal, 589 F.2d 862, 890 (5th Cir. 1979) ("[Intoxication] is a factor to consider, but that fact alone is not sufficient to undermine [their] consent.") (quoting United States v. Hall, 565 F.2d 917, 921 (5th Cir. 1978)). Jacquez did not appear to the officers to be intoxicated, and he was coherent. Thus, he had the capacity to give voluntary consent. Third, there were only four police officers present, none of the officers had pointed a gun at Jacquez, and when consent was given, none of the officers' guns were drawn. See United States v. Kimoana, 383 F.3d 1215, 1226 (10th Cir. 2004) ("[S]everal courts have found a defendant's consent to be voluntary where the officers approached the defendant with guns drawn, but then holstered them once the area was secured and before asking for consent to search." (citing United States v. Mitchell, 209 F.3d 319, 324 (4th Cir. 2000); United States v. Broussard, 80 F.3d 1025, 1036 (5th Cir. 1996); United States v. Alfonso, 759 F.2d 728, 741 (9th Cir. 1985); United States v. Jones, 154 F. Supp. 2d 617, 620-21 (S.D.N.Y. 2001))); United States v. Iribe, 11 F.3d 1553, 1557 (10th Cir. 1993) (holding that consent

---

[6] Jacquez did not testify concerning this issue -- either by affidavit or by live voice testimony. Indeed he absconded before he could testify. See Transcript of Hearing at 3:1-4:3 (taken January 27, 2005). Hence, his assertions of facts are unverifiable and made in his briefs. The Court has found the officers statements -- all were made under oath in the Court's presence -- to be credible. The Court does not find Jacquez statements in his brief to be credible where inconsistent with the officer's testimony.

was voluntary even though there were five officers present and defendant was in handcuffs).  Even though two of the officers initially wore ski masks and Jacquez was detained and handcuffed in the back of the police car, the atmosphere was calm and Jacquez did not exhibit any signs of fear.  See id.  Finally, although there is no evidence on the record that the officers told Jacquez that he could refuse to consent, that is not dispositive.  See United States v. Zubia-Melendez, 263 F.3d 1155, 1163 (10th Cir. 2001) (affirming district court's finding that consent was voluntary even though officers did not inform defendant that he could refuse to consent).

The consent was also specific and unequivocal.  When asked for permission to search the home for guns, drugs, and illegal contraband, Jacquez verbally consented.  Although the consent-to-search form did not specify what items were to be searched, see Consent to Search at 1, the officers specifically told him that they wanted to search for guns, drugs, and illegal contraband.  Jacquez then gave verbal consent to this specific request.  See Transcript of Hearing at 187:10-14 (Harley).

**B.     THE POLICE DID NOT COERCE OR DECEIVE THE DEFENDANT INTO GRANTING CONSENT**

There is no evidence on the record that the officers coerced or deceived Jacquez into granting consent.[7]  Jacquez argues that when the police officers told Jacquez that they were not concerned about user amounts of marijuana, but rather were looking for drugs, guns and illegal contraband, they deceived him into granting consent.  Such a conclusory statement standing alone is insufficient to prove deceit.  Defendant has not introduced any evidence on the record that the officers induced Jacquez' consent through deceit.  The facts on the record corroborate that the officers were not

---

[7]  Jacquez contends in his brief that the officers told him they would go easy on him if he cooperated.  See Motion to Suppress Illegally Gathered Evidence (Doc. 38) (filed September 30, 2004).  Jacquez, did not, however, show up to testify as to these events in person, and the allegation in his brief is not supported by the record.

concerned about user amounts of marijuana. After making the above statement, the officers specifically informed Defendant that they wanted to search for drugs, guns and illegal contraband. Thus, even though the officers told Jacquez that they were not concerned with user amounts of marijuana, Jacquez knew the officers wanted to search for drugs.

### C.      THE TOTALITY OF THE CIRCUMSTANCES SHOW THAT THE CONSENT WAS VOLUNTARY

The Court finds that Jacquez specifically and without equivocation consented verbally and in writing to a search of his residence. He verbally consented to a specific search request, and he signed a consent-to-search form. The record shows that Jacquez freely and intelligently gave his consent. Defendant was coherent and did not appear to the officers to be intoxicated. A small amount of time passed between the arrest and the consent, and although he was handcuffed in the presence of four officers, the atmosphere was calm, and Jacquez did not exhibit any fear. Thus, based on the totality of the circumstances, the Court finds that the United States has met its burden as articulated in United States v. Pena-Sarabia, 297 F.3d at 986. The United States has presented "clear and positive testimony that consent was unequivocal and specific and freely and intelligently given," and that the police did not "coerce or deceive the defendant into granting his consent." Id. Jacquez' consent to search the house was voluntary.

**IT IS ORDERED** that the Defendants' Motion to Suppress Illegally Gathered Evidence, and Defendant Dominic Jacquez' Motion to Suppress Illegally Gathered Evidence are denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

David C. Iglesias
  United States Attorney for the
    District of New Mexico
James R.W. Braun
  Assistant United States Attorney
    for the District of New Mexico
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Joe M. Romero, Jr.
Albuquerque, New Mexico

      *Attorney for Defendant Dominic Jacquez*

Hank Farrah
Albuquerque, New Mexico

      *Attorney for Defendant Veronica Gallegos*